IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| ELIZABETH ACEVEDO, individually, on behalf of all wrongful death beneficiaries, and on behalf of the ESTATE OF CRISTIAN CUELLAR, deceased <br><br> Plaintiff, <br><br> v. <br><br> BROOKHAVEN YOUTH RANCH, INC., BROOKHAVEN YOUTH RANCH FOUNDATION, JON OLIVARES, MARGO OWENS, MICHAEL SAWYER, PERI AVANT, DARRELL DEGRATE, DENNIS COOKE, and A.S. <br><br> Defendants. | § § § § § § § § § § § § § § § § § § Civil Action No. 6:16-cv-397 |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

ELIZABETH ACEVEDO, individually, on behalf of all wrongful death beneficiaries, and on behalf of the ESTATE OF CRISTIAN CUELLAR, deceased, hereby files this suit against BROOKHAVEN YOUTH RANCH, INC., BROOKHAVEN YOUTH RANCH FOUNDATION, JON OLIVARES, MARGO OWENS, MICHAEL SAWYER, PERI AVANT, DARRELL DEGRATE, DENNIS COOKE, and A.S. and would respectfully show as follows:

### I. JURISDICTION AND VENUE

1. Jurisdiction is conferred by 28 U.S.C. §1343(4) which provides this Court with original jurisdiction in all civil actions brought under any act of Congress for the protection of civil rights, and by 42 U.S.C. §2000e-5(f)(3) which provides this Court with

original jurisdiction in all civil actions with claims arising under 42 U.S.C. §2000 et seq.

2.     This Court has general personal jurisdiction over the Defendants as they reside and/or work in the Western District of Texas.

3.     This Court has specific *in personam* jurisdiction over defendants because this cause arises out of conduct that caused the death of Cristian Cuellar while he was in the custody of the Youth Ranch in McLennan County, which is within the Western District of Texas.

4.     Venue for this cause is proper in the Western District of Texas pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in McLennan County, which is within the Western District of Texas, Waco Division.

## II. PARTIES

5.     ELIZABETH ACEVEDO is a resident of Travis County, Texas. She was the mother of CRISTIAN CUELLAR, deceased. She brings this action individually, on behalf of all wrongful death beneficiaries, and as the personal representative of the ESTATE OF CRISTIAN CUELLAR (hereinafter, the "Deceased").

6.     BROOKHAVEN YOUTH RANCH, INCORPORATED, is a Texas corporation, and may be served with process by serving its registered agent, Linda Harrison-Goates, at 5467 Rogers Hill Road, West, Texas 76691.

7.     BROOKHAVEN YOUTH RANCH FOUNDATION, is a Texas corporation, and may be served with process by serving its registered agent, Bill Gholson, at the registered office on file, which is 5467 Rogers Hill Road, West, Texas 76691, or by serving its president, Don Francis, at the principal office on file, which is 5467 Rogers

2

Hill Road, West, Texas 76691.

8. Brookhaven Youth Ranch, Inc. and Brookhaven Youth Ranch Foundation operated the Brookhaven Youth Ranch ("the Youth Ranch"), a juvenile treatment facility, where juvenile offenders were involuntarily confined after commitment to the Youth Ranch by a juvenile court. As such, at all relevant times, Brookhaven Youth Ranch, Inc. and Brookhaven Youth Ranch Foundation operated the Youth Ranch under color of law. Upon information and belief, the Youth Ranch is a recipient of federal funds.

9. JON OLIVARES was employed by the Youth Ranch as a security guard supervising the children in the facility's custody. As such, at all relevant times he was acting under color of state law.

10. MARGO OWENS was employed by the Youth Ranch as a security guard supervising the children in the facility's custody. As such, at all relevant times she was acting under color of state law.

11. MICHAEL SAWYER was employed by the Youth Ranch as a security guard supervising the children in the facility's custody. As such, at all relevant times he was acting under color of state law.

12. PERI AVANT was employed by the Youth Ranch as a security guard supervising the children in the facility's custody. As such, at all relevant times she was acting under color of state law.

13. DARRELL DEGRATE was employed by the Youth Ranch as a security guard supervising the children in the facility's custody. As such, at all relevant times he was acting under color of state law.

14. DENNIS COOKE was the executive director of the Youth Ranch, and

responsible for all facets of the facility's operation. He was the policymaker for the facility. As such, at all relevant times he was acting under color of state law.

15. A.S. is a minor child, presently, upon information and belief, incarcerated in a facility of the Texas Juvenile Justice Department. Upon information and belief, his parents' rights have been terminated, and he is thus a ward of the State of Texas. He can be served through his presumed custodians, the Texas Juvenile Justice Department, through its executive director, David Reilly, at 11209 Metric Blvd., Bldg. H, Ste. A, Austin, TX 78758. Pursuant to this Court's local rules, because he is a minor, he is identified only by his initials, though his true name is known to the Plaintiff and can be provided to the Defendants.

### III. STANDING

16. ELIZABETH ACEVEDO is the biological mother of the Deceased. She brings suit against the Defendant individually, as a wrongful death beneficiary under Subchapter A of Chapter 71 of the Texas Civil Practices and Remedies Code ("CPRC") (for herself and for all statutory beneficiaries), and on behalf of the Estate of the Deceased pursuant to Subchapter B of Chapter 71 of the CPRC. No administration is pending for the Deceased and none is necessary or desired by the heirs. At the time of his death, Mr. Cuellar had no children, and no surviving spouse.

17. ELIZABETH ACEVEDO, in her individual and representative capacities, is hereinafter collectively referred to as the "Plaintiff".

### IV. ASSUMED AND COMMON NAMES

18. The Plaintiff hereby gives notice to the Defendant that it is being sued in all of its businesses or common names regardless of whether such businesses are

4

partnerships, unincorporated associations, individuals, entities, or private corporations.

## V. FACTS

19. Cristian Cuellar was just sixteen years old when he was violently kicked to death by another child while in the custody of the Youth Ranch.

20. Per the Youth Ranch's website, its stated mission is "to provide a therapeutic sanctuary where children feel safe, parents feel reassured and referral sources feel appreciated and included in the effort to provide a compassionate, healing environment where youth can be strengthened socially, spiritually and emotionally." Unfortunately, the Youth Ranch was actually operated so poorly that a persistent culture of resident-on-resident violence put children's safety in serious jeopardy.

21. Cristian was a slight teenager, standing only 5' 6" tall, and weighing only 130 pounds. At the time of his death, he had only recently turned sixteen years old.

22. Before becoming a resident at the Youth Ranch, Cristian had been under the supervision of the Texas juvenile probation system for such things as substance abuse issues and mental health issues. Before his incarceration at the Youth Ranch, he had been treated at other inpatient treatment facilities, and diagnosed with mood disorder, oppositional defiant disorder, and attention/deficit hyperactivity disorder. His disabilities caused him to act impulsively.

23. Cristian's mental illnesses substantially limited his ability to perform major life activities such as concentrating, thinking, caring for himself, and performing everyday tasks. Compared with an average individual without disabilities, Cristian's ability to perform these major life activities was substantially impaired, such that he required treatment in inpatient facilities like the Youth Ranch. He was referred to the

5

Youth Ranch by the Travis County juvenile probation department and juvenile court after an arrest for marijuana possession to "learn how to respect authority figures and rules," improve his "decision-making skills" and "problem solving skills," and "anger management."

24.     The juvenile court and Travis County Juvenile Probation Department involuntarily made him a resident of the Youth Ranch.

25.     Upon information and belief, the Youth Ranch had actual or constructive knowledge of Cristian's mental disabilities, and his need for accommodations to access the Youth Ranch's services and programs.

26.     While a resident of the Youth Ranch, Cristian was supervised by staff members of the facility, including Defendants Olivares, Degrate, Sawyer, Avant, and Owens, who were charged with protecting his well-being and safety. Owens, Olivares, Sawyer, Degrate, and Avant's duties on the day of the fatal incident included supervising various dormitories at the Youth Ranch, including the dormitories Cristian and A.S. were assigned to live in.

27.     The Youth Ranch routinely allowed the children at the facility to engage in a violent "game" called "King Pin" where the children would fight each other, attempting to restrain weaker children on the floor to "pin" them. The staff at the Youth Ranch would often simply observe this child-on-child violence, without making any attempt to intervene, creating a Lord of the Flies atmosphere at the Youth Ranch. Staff at the Youth Ranch, including Cooke, Olivares, Degrate, Sawyer, Avant, and Owens, routinely dismissed this violence as mere "horseplay," and did little to nothing to prevent "King Pin," though the "game" was obviously dangerous, especially in the context of a

6

juvenile detention facility.

28. One morning, when Olivares was supervising the children in the dormitory, a "King Pin" battle took place, where A.S., an older child in the Youth Ranch's custody, fought Cristian. The fight was broken up, and A.S. was separated from Cristian. Sawyer took A.S. to a different dorm. Olivares, Sawyer, Degrate, Avant, and Owens knew Cristian and A.S. were involved in a "King Pin" incident, and knew that day that Cristian needed to be separated from A.S. for Cristian's own safety.

29. A.S. was older than Cristian, and was a much larger teenager – standing 6' 0", and weighing 175.5 pounds. He was six inches taller than Cristian, and outweighed him by over 45 pounds. Moreover, he had a documented history of "physical aggression and anger management difficulties." In short, following the "King Pin" fight, it was clear to any competent security officer, including Olivares, Sawyer, Degrate, Avant, and Owens, that A.S. was a serious danger to Cristian, and he needed to be protected from A.S.

30. Despite this obvious danger, and taking steps to separate Cristian, Owens, Olivares, Sawyer, Degrate, and Avant failed to secure the doors of the buildings separating Cristian and A.S., and knew that these doors were frequently left unlocked, allowing children to move between secure areas of the facility. This known movement of children between portions of the facility was obviously dangerous, as it prevented children at risk of violence from being kept apart from their attackers. Failing to lock the doors denied Cristian an accommodation for his disability.

31. Later that day, Owens, Olivares, Sawyer, Degrate, and Avant allowed Cristian and A.S. to be in the same dormitory, though A.S. had to be separated from

7

Cristian earlier in the day. In fact, Owens saw Cristian and A.S. together in the same dorm she was supervising, despite knowing about the previous "King Pin" incident. Failing to keep the children separated denied Cristian an accommodation for his disability.

32. Olivares was tasked with supervising Cristian, but lost track of him, allowing Cristian and A.S. to be in the same location. Olivares knew separating Cristian from A.S. was essential to prevent violence, but consciously failed to separate the children. Olivares denied Cristian an accommodation for his disability by failing to ensure he remained separated from A.S.

33. Predictably, A.S. attacked Cristian again, as staff at the facility routinely allowed.

34. Pursuant to the policy, practice, and custom of the Youth Ranch, when Owens saw A.S. begin to fight Cristian, she did not attempt to restrain A.S. or separate the children, but instead called a "Code Blue" for other security officers to respond.

35. Because the facility was understaffed, there were insufficient security officers to immediately break up the fight. Failing to sufficiently staff the facility denied Cristian an accommodation for his disability.

36. By the time Sawyer, Avant, Olivares, and Degrate arrived, however, A.S. threw Cristian to the floor, then viciously kicked Cristian in the head, killing him.

37. A.S. was convicted of murdering Cristian, and sentenced to a lengthy prison term. Upon information and belief, he is presently incarcerated in a facility of the Texas Juvenile Justice Department.

38. The Youth Ranch failed to implement a "safety plan" following the first

8

fight, which, if implemented, would have required Cristian and A.S. to be kept separate. However, Olivares, Owens, Sawyer, Degrate, and Avant had actual knowledge of the first fight, but still did nothing to keep Cristian and A.S. separated, denying Cristian a reasonable accommodation for his disability.

39. Prior to Cristian's death, the Texas Department of Family and Protective Services had cited the Youth Ranch numerous times for violations related to resident-on-resident violence. Despite the seriousness of these allegations, which took place over a number of years prior to Cristian's death, the Youth Ranch did nothing to cure these significant violations, proximately causing Cristian's death. Cooke had actual knowledge of each violation identified by DFPS.

40. Among other serious violations noted by DFPS, the Youth Ranch failed to:

a) Provide minimum training to its staff, including critical, mandatory training on emergency behavior intervention and supervision of the children;

b) Notify DFPS of serious incidents involving suspected abuse or neglect of residents (including child-on-child sexual assaults);

c) Using excessive force and corporal punishment against residents, including numerous instances where children were grabbed by the neck, struck in the head, slammed children against walls and the floor, placing children at risk of severe injury;

d) Relying on other children to assist in restraint of residents (demonstrating a severe understaffing at the facility, as well as a culture of violence);

e) Failing to intervene when staff used excessive force against children;

f) Failing to adequately supervise children while escorting them between buildings at the facility;

g) Failing to de-escalate conflicts between children (and even provoking violence between children), resulting in injuries to the children;

h) Provoking violence between children;

i) Failing to meet required child-to-staff ratios, resulting in child-on-child violence¶;

j) Failing to supervise children in its custody (including staff sleeping on duty), resulting in children being left alone, unobserved, at risk of violence;

k) Failing to supervise children in its custody, resulting in children moving between secure locations and even running away from the facility;

l) Assisted a child in running away from the facility so that staff could have sexual relations with the child;

m) Falsifying witness statements; and,

n) Failing to secure doors to prevent movement by children between secure portions of the facility.

41. Each of these violations was so pervasive as to constitute the policy, practice, and custom of the Youth Ranch.

42. In fact, during the five years before Cristian's death, the Youth Ranch had been cited 130 times by DFPS, with over 100 "high" or "medium high" severity violations. Had the Youth Ranch cured these violations timely, Cristian would likely be

alive today.

43. Cooke, as the executive director of the Youth Ranch, was well aware of each of the above-identified deficiencies, as he was ultimately responsible for the facility's operation. Upon information and belief, he was aware of each violation noted by DFPS in the five years before Cristian's death, and the culture of violence that pervaded the Youth Ranch. Cooke knew that children at the facility were regularly assaulted, and that, as described above, only pitiful, plainly inadequate, steps were taken to protect children from violence. Despite his awareness of these systemic, pervasive problems, Cooke did nothing to protect children like Cristian, and was deliberately indifferent to the serious threat to Cristian's safety.

## VI. CAUSES OF ACTION

**A.    42 U.S.C. § 1983 – Violations of Cristian's Fourteenth Amendment Rights**

44. The Youth Ranch's employees, including Cooke, Olivares, Owens, Sawyer, Avant, and Degrate, knew children were regularly assaulted by other children at the Youth Ranch, and that the Youth Ranch failed to protect children like Cristian.

45. Despite knowing these assaults happened regularly, the Youth Ranch failed to adequately protect the children in its care from a known substantial risk of assault, and knowingly failed to adequately staff the Youth Ranch to prevent child-on-child violence.

46. In fact, Olivares, Owens, Sawyer, Avant and Degrate knew that Cristian had previously been victimized by A.S. on the day of his death, but failed to take minimal measures to separate the two children (including, but not limited to, physically separating them and locking doors in the locations they were moved to). Pursuant to the policy,

practice, and custom prevalent at the Youth Ranch, Olivares, Owens, Sawyer, Avant, and Degrate did nothing to protect Cristian from A.S., even though a) they had actual knowledge A.S. had already assaulted Cristian that day, b) A.S. was obviously a much larger, stronger child than Cristian, and c) the Youth Ranch had a long, documented history of violence between its residents.

47. Likewise, Cooke knew that children at the facility were regularly assaulted, that staff did little to prevent violence, that the measures that were taken were woefully ineffective, and that the staff at the Youth Ranch were wholly untrained and incapable of preventing violence at the facility.

48. Accordingly, Defendants acted with deliberate indifference to Cristian's constitutional right to be protected from harm during incarceration, in violation of the Fourteenth Amendment to the U.S. Constitution.

49. The Youth Ranch had the following policies, practices, and customs at the facility that were the moving force causing Cristian's injuries:

    a) **Inadequate Staffing**: the Youth Ranch knowingly failed to adequately staff the facility, though it knew inadequate staffing would prevent officers from intervening to protect inmates from assault.

    b) **Inadequate Training**: the Youth Ranch knowingly failed to adequately train its officers about preventing and stopping assault and "horseplay" before it escalated to violence, and failing to train officers in restraint of children.

    c) **Inadequate Supervision**: the Youth Ranch failed to adequately supervise the children in its custody, though the known and obvious consequence of failing to supervise incarcerated people would obviously include violence;

    d) **Inadequate Security**: the Youth Ranch routinely failed to lock doors separating children, failed to separate children from residents who posed them an identified risk of harm, and allowed children to leave their assigned locations.

50. Likewise, high-ranking officials at the Youth Ranch, including Cooke, knew that fights between children and "King Pin" was a common practice at the facility, knew that the facility was not adequately staffed, and knew that inmates like Cristian were going to suffer due to the Youth Ranch's deliberate choices not to adequately protect the children in its custody.

51. Plaintiff brings these claims pursuant to 42 U.S.C. § 1983 seeking redress for violations of Cristian's Fourteenth Amendment right to be protected from harm while in the custody of the state.

### B. Americans with Disabilities Act and Rehabilitation Act

52. The Youth Ranch has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

53. Further, Title III of the ADA applies to the Youth Ranch and has the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq.* (2008).

54. The Youth Ranch is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

55. For purposes of the ADA and Rehabilitation Act, Cristian was a qualified individual regarded as having a mental impairment that substantially limited one or more of his major life activities. Despite knowledge of his disabilities, the Youth Ranch's officers intentionally discriminated against him, under the meaning of the ADA and

Rehabilitation Act, by failing and refusing to provide him accommodations to safely access the facility, including failing to protect him from violence, or otherwise accommodating his disability to save his life.

56. As alleged above, the Youth Ranch intentionally failed and refused to reasonably accommodate Cristian's mental and physical disabilities while in custody, in violation of the ADA and Rehabilitation Act. That failure and refusal proximately caused his death.

57. Cristian died as a direct result of the Youth Ranch's intentional discrimination against him. Accordingly, Plaintiff is entitled to the maximum amount of compensatory damages allowed by law.

    **C.**    **Negligence**

58. The events leading up to the Cristian's injuries and death, and the injuries and damages sustained by Cristian and the Plaintiff, were a direct and proximate result of the negligence of the Defendants. Specifically, it is hereby alleged that the Defendants, through their agents, successors and assigns, were negligent in one or more of the following manners:

    a) in failing to properly train their staff members;

    b) in failing to establish an adequate safety program for its residents;

    c) in failing to provide adequate security for the facility (including, but not limited to, failing to ensure doors separating residents locked);

    d) in failing to adequately supervise its staff members and residents;

    e) in failing to properly qualify their staff members;

    f) in failing to establish adequate policies and/or adequately enforce policies

    for the protection of its residents; and

 g) in negligently hiring, supervising and retaining staff members who were unqualified, incompetent, and careless with respect to the residents.

59. Each of the foregoing acts and omissions of the Defendants, taken either singularly or in combination with others, were performed in a manner other than as a person of ordinary prudence would have performed under the same or similar circumstances, and constitute negligence on the part of the Defendants.

60. Cooke, Olivares, Owens, Sawyer, Avant, and Degrate were each acting under the course and scope of their employment with the Youth Ranch at all relevant times, and, as such, the Youth Ranch is vicariously liable for any of their individual negligence.

## VII. DAMAGES

61. As a direct and proximate result of the negligence, intentional discrimination, and/or deliberate indifference of the Defendants as described above, the Plaintiff suffered pecuniary damages, loss of companionship and society, and mental anguish, as well as loss by virtue of the destruction of the respective parent-child relationships, including the right to love, affection, solace, comfort, companionship, society, emotional support, happiness and consortium of Cristian, all of which damages are permanent and lasting, and for which she now sues.

62. As a direct and proximate result of the negligence of the Defendants, the Deceased sustained the following damages, which are now sued for: (i) physical pain and suffering and mental anguish; (ii) medical and hospital expenses; and (iii) funeral and burial expenses.

### VIII. GROSS NEGLIGENCE AND EXEMPLARY DAMAGES

63. The acts of the Defendants caused Cristian's death, constituting gross negligence or deliberate indifference on the part of the Defendants. When viewed objectively from its standpoint at the time of the death of the Deceased, their acts of knowingly failing to prevent violence at the Youth Ranch involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The Defendants had actual, subjective awareness of said risk. Nevertheless, the Defendants proceeded with conscious indifference to the rights, safety and welfare of others, and recklessly and irresponsibly failing to prevent a known substantial risk of violence, thereby causing Cristian's death.

64. The Defendants are subject to exemplary damages, and the Plaintiff seeks to recover said damages in an amount to be determined by the trier of fact.

### IX. PREJUDGMENT AND POST-JUDGMENT INTEREST

65. Plaintiff seeks prejudgment and post-judgment interest in the maximum amounts allowed by law.

### X. ATTORNEYS' FEES

66. Plaintiff is entitled to recover attorneys' fees and costs of court, including expert witness costs, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a.

### XI. TRIAL BY JURY

67. Plaintiff demands trial by jury.

68. **WHEREFORE, PREMISES CONSIDERED**, ELIZABETH ACEVEDO, individually, on behalf of all wrongful death beneficiaries, and on behalf of

the ESTATE OF CRISTIAN CUELLAR, deceased, prays that Defendants BROOKHAVEN YOUTH RANCH, INCORPORATED, BROOKHAVEN YOUTH RANCH FOUNDATION, JON OLIVARES, MARGO OWENS, MICHAEL SAWYER, PERI AVANT, DARRELL DEGRATE, and A.S. be cited to appear and answer herein, that this cause be set for trial before a jury, and that ELIZABETH ACEVEDO, individually, on behalf of all wrongful death beneficiaries, and on behalf of the ESTATE OF CRISTIAN CUELLAR, recover judgment of and from Defendants for actual and exemplary damages in such amount as the evidence may show and the jury may determine to be proper, together with costs, pre-judgment interest, post-judgment interest, and such other and further relief to which they may be justly entitled.

Respectfully submitted,

By   /s/ Jeff Edwards
JEFFREY SCOTT EDWARDS
State Bar No. 24014406
EDWARDS LAW FIRM
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
Telephone: (512) 623-7727
Facsimile: (512) 623-7729
jeff@edwards-law.com

AND

RAUL STEVEN PASTRANA
State Bar No. 15560845
PASTRANA LAW FIRM
42 East Avenue
Austin, Texas 78701
Telephone: (512) 474-4487

      Facsimile: (512) 322-9885
      steven@pastranalaw.com

      ATTORNEYS FOR PLAINTIFF